BANK OF RUSSELLVILLE *v.* BOWIE.

4-7119                                   173 S. W. 2d 1007

Opinion delivered July 12, 1943.

*J. M. Smallwood,* for appellant.

*Russell C. Roberts* and *Clark & Clark,* for appellee.

GRIFFIN SMITH, Chief Justice. Bank of Russellville and R. W. Sibley sued O. G. Bowie to enforce a crop lien covering the first year of rents alleged to be due under a contract whereby Sibley leased Bowie 744 acres for 1942, 1943, and 1944. Attachment was sustained.

The Bank received by assignment the 1942 rent note for $3,000 and appended it to Sibley's pre-existing Bank obligation, credit (presumably) to be given when Bowie paid.

The appeal questions correctness of Instruction No. 1, given at defendant's request,[1] in which "reasonable" appears. The word was also used in Instruction No. 2, given at the request of plaintiffs, the interpolation having been objected to. It is also insisted that, as a matter of fact, appellee was not prevented from making a crop.

The contract contained a so-called "overflow" clause, as shown in the margin.[2] Of 377 acres suitable for cultivation,[3] 225 were west of a levee and 152 acres east. The AAA program, to which Bowie subscribed, limited cotton planting to 140 acres, 65 of which were east of the levee where there was no flood damage.

Accepting Bowie's estimate that there were 225 acres in the overflow area west of the levee; that 65 acres were planted to cotton; that high water the latter part of April and early in May destroyed crops; that, in replanting, fifteen additional acres were put in cotton, but ten acres were plowed up to satisfy the AAA contract—result is that an attempt was made to raise a cotton crop on 70 acres. The yield was twelve bales.

On the remaining 155 acres it is in evidence that the only crop was 250 bushels of corn, worth $187.50. While

[1] "If you find from the evidence that a portion of the lands involved in this suit were overflowed by the Arkansas River in the spring of 1942 and by reason thereof the defendant was prevented from making a reasonable crop thereon, the plaintiff will be limited to one-fourth of the cotton and one-third of all other crops actually produced on such overflowed lands, and plaintiff will be entitled to cash rent of $8 per acre on the remainder of the 337 acres of tillable land covered by the contract; also one-fourth of the government rental."

[2] "It is further understood and agreed by and between the parties hereto that in case of an overflow to this farm by the Arkansas River to the extent of preventing a cotton crop proposed to be raised thereon by the Lessee, then and in that event the portion of this land so overflowed, the rents thereon shall be based on the third and fourth crops and on the government rentals and other payments, and the $3,000 rental note shall be reduced to the amount of 377 acres bears to the total amount of the rent."

[3] On direct examination Bowie was asked:—"How many acres of land [were there] in cultivation on that farm?" Answer: "Three hundred seventy-seven." Question: "How many acres of that 377 are west of the levee?" Answer: "About 225, according to the government map." Question: "That would leave about 150 [acres] on the east side?" Answer: "Yes, sir." [If 225 acres were west of the levee, the remainder would be 152 instead of 150. While 377 acres at $8 would amount to $3,016, the parties have treated the per acre rent as being $8 instead of $7.95 plus.]

it is not clear that none of the corn was on the 70 acres where cotton was sought to be grown from a second planting, inference to be drawn from Bowie's testimony is that lands other than the 70 acres were used for corn. He says that 50 acres were so planted. This would leave 105 acres west of the levee uncultivated.

The jury's verdict was against Bowie for $1,728.50, "and one-fourth of the governmental rental west of the levee." The defendant has not objected, either by direct or cross appeal. The method employed in arriving at the verdict is not disclosed.

Instruction No. 1 told the jury that if it should find that a *portion*[4] of the land *in this suit* was overflowed, and the defendant was prevented from making a *reasonable crop thereon,* plaintiffs would be limited to a fourth of the cotton and a third of all other crops produced *on such overflowed lands,* and to cash rent of $8 "on the remainder of the 337 acres of tillable lands; also one-fourth of the government rental."

Was the Instruction correct?

The contractual provision, as distinguished from the instruction, is that should an overflow "prevent [the growing] of a cotton crop proposed to be raised thereon by the lessee, then, in that event, [as to] the portion of the land so overflowed," rents are to be on the third and fourth basis, plus government allowance.

The trial court construed the contract to mean that reduction of rentals applied only to that portion of the 377 acres so substantially affected by high water as to prevent Bowie from making a "reasonable" crop.[5]

It is necessary to determine what part of the land was affected by the correct instruction so given. Bowie testified that all of the 225 acres west of the levee was under water; hence, he says, regardless of the fact that it was contemplated use of the land should conform to

---

[4] Italics supplied.

[5] Appellants' brief copies Instruction No. 1 as it appears in the transcript, where the reference is to "the remainder of the 337 acres." An examination of the original instruction on file with the circuit clerk at Conway shows that the court correctly said "377" instead of "337."

the government program limiting cotton to not more than 140 acres, ". . . *the portion of this land so over-flowed*" means all lands covered by water to the extent that a reasonable crop could not be grown. Application of this reasoning would mean that Bowie is liable for a fourth of the twelve bales grown west of the levee, and a third of 250 bushels of corn.

Meaningless is that part of the contract which reads: ". . . and the $3,000 rental note shall be reduced to the amount of 377 acres bears· to the total amount of rent." Probably the intent was to say, ". . . reduced in the proportion that the overflowed lands bear to 377 acres." The jury was justified in charging Bowie with $1,216 cash rent on 152 acres east of the levee. There was evidence a fourth of twelve bales of cotton (with seed) grown on 70 acres west of the levee was worth $300, and that a third of 250 bushels of corn grown on 50 acres of the remaining 155 west of the levee equaled $62.50, making a total of $1,578.50. But the judgment, exclusive of government aid, was for $1,728.50—an amount $150 greater than would be justified by the proof we have referred to. On the other hand, appellants insist that if reductions are to be made, appellee should be charged with: Cash rental on land east of the levee, $1,200; crop rent, (a fourth on 12 bales of cotton grown on 70 acres) $300; crop rent on 50 acres appellee testified he planted to corn, $62.50; cash rent on 105 acres west of the levee unaccounted for, $840—total, $2,402.50.

If the contract is construed to mean that rentals of a third and fourth were payable on lands so badly over-flowed that "reasonable" crops could not be grown, appellee has accounted for the 105 acres, for his testimony is that the entire area went under water, "some" to such an extent that it was non-productive. Bowie's statement was that 50 and 70 acres were cultivated. The difference between the sum of these figures and 225 is 105.

We do not attempt to harmonize the difference shown in appellee's computations and those of the jury because attorneys for Bowie say at pages three and

four of his brief: ''Appellee contends that he ought to pay cash rentals (amounting to $8 per acre) for the lands east of the levee, and that he ought to pay crop rents of one-third and one-fourth for the lands west of the levee. On trial of the case below, the jury found for the defendant and fixed the rents at $1,728.50, which sum the appellee has, at all times since trial, stood ready and willing to pay.''

Affirmed.

Mr. Justice ROBINS not participating.

McFADDIN, J., (concurring). The following are my reasons for concurring in the result reached by the majority in this case:

1. It is not contended by the bank that it was ever an innocent purchaser and holder of the Bowie rent note involved herein. The bank had full knowledge at all times of the terms of the rent note, and the bank does not claim or have any rights greater than the rights of the appellant, Sibley.

2. Sibley all the time had the right to interpret the rent contract with Bowie, and to agree with Bowie on the meaning of the overflow clause.

3. Bowie testified that Sibley did agree with him that the rent for 1942 was to be on the third and fourth basis. On Tr. p. 44-45, Bowie testified: ''Q. Did you have a conversation with Mr. Sibley along about the time the water went down, or was going down, with reference to whether or not it was worthwhile to replant any cotton on the west side of the levee? A. I don't recall after the water had gone down, but we could see the water from where we were. He was up at the place and we discussed the matter and when we tried to go across the farm the heavy mud would stick to the side of the wheels, but I asked him about planting the cotton over, or plant it back in corn, and he said it would not make much difference, but to go ahead and plant it in cotton, and that it would be on a third and fourth basis.''

Bowie gave this testimony on direct examination. Sibley never denied it in any way. So the record stands

undenied that Sibley *did agree* to the third and fourth basis for the 1942 crops.

4. The above being true, the interpretation of the overflow clause was rendered moot—the parties had interpreted it themselves. I do not agree with the interpretation of the overflow clause as expressed by the majority opinion herein, because—as I see it—Bowie was not *prevented* from making a cotton crop on the overflowed land; he did in fact make a cotton crop; and in the absence of the interpretation between the parties, as above set forth, then under the wording of the overflow clause, Bowie would be liable for the full note. But while the water was still on the land, or thereabouts, Sibley agreed with Bowie for the third and fourth basis for the 1942 crops, and he cannot now be heard to assert the contrary.

So, I concur in the affirmance of the case.